IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**TEILL REYNOLDS,**

    **Plaintiff,**

    v.                                                                    CASE NO.  24-3132-JWL

**(FNU) MABLE, et al.,**

    **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983.  Plaintiff is a prisoner at the Lansing Correctional Facility in Lansing, Kansas ("LCF").  The Court granted Plaintiff leave to proceed in forma pauperis.  On September 20, 2024, the Court entered a Memorandum and Order (Doc. 4) ("M&O") finding that the proper processing of Plaintiff's Eighth Amendment claims could not be achieved without additional information and directing Kansas Department of Corrections ("KDOC") officials to submit a *Martinez* Report.  The *Martinez* Report (Docs. 9 and 10) (the "Report") was filed, and on January 3, 2025, Plaintiff filed a response to the Report (Doc. 12).  This matter is before the Court for screening.  The Court's screening standards are set forth in the Court's M&O.

**I. Nature of the Matter before the Court**

Plaintiff's claims are set forth in the Court's M&O and are repeated here.  Plaintiff alleges that he did not receive adequate medical care at LCF.  Plaintiff alleges that he slipped and fell in the shower on June 15, 2023, injuring his left arm. (Complaint, Doc. 1, at 2.)  On June 16, 2023, Officer Sloan gave him a pass to the medical clinic after calling the clinic and advising them of

1

the situation. *Id*. at 4. When Plaintiff arrived at the clinic, Nurse Mable refused to treat Plaintiff and denied that Sloan had called. *Id*. at 2, 5. Plaintiff returned to the pod, and Sloan again called the clinic and sent Plaintiff back. *Id*. Mable again refused to treat Plaintiff and asked him to leave. *Id*. Plaintiff declined to leave until he was seen by a doctor. *Id*. at 2. Mable called for SORT officers. *Id*. at 5. When the SORT team arrived, they realized Plaintiff's arm was broken, he had a pass, and Sloan had called twice. *Id*. The SORT officers asked for the doctor. *Id*. Dr. Wilson came out of his office with a female doctor. *Id*. The doctors examined Plaintiff's arm and determined that it was broken. *Id.* They told Plaintiff that he needed an x-ray. *Id*. Because the x-ray technician was on leave, Plaintiff was told that he would be taken to the University of Kansas Medical Center ("KU"). *Id*. The doctors applied a temporary cast. *Id*.

Plaintiff waited in the clinic for two hours to be transported to KU. *Id*. He was then told to return to his pod to wait for transport to KU. *Id*. Plaintiff waited for 8 hours while suffering serious pain. *Id*. at 2. He finally called for medical at around 8:00 p.m. *Id*. at 5. Nurse Hanna responded and said that she did not know anything about Plaintiff's injury or that he was meant to go to the hospital. *Id*. Plaintiff was advised that 6 prisoners had been taken to KU earlier for K-2 use. *Id*. at 2. Plaintiff was told that they forgot about him, and he would now have to wait until Monday, June 20, 2023, because all personnel with authority to send him out were on vacation until then. *Id*. at 2-3.

Plaintiff was called to the clinic on Monday, June 20, and his arm was x-rayed. *Id*. at 3. The technician said he would need a "foot long" plate to fix his broken arm. *Id*. The x-ray was sent to KU. *Id*. They responded that Plaintiff needed immediate surgery, so Plaintiff was transported to KU. *Id*. Plaintiff had surgery on June 20 and was given pain medication. *Id*. Plaintiff alleges that he did not receive any pain medication for his injury until he was treated at

KU. *Id*. at 3, 9. He asserts that he has nerve damage and loss of movement as a result of the delay in treatment. *Id*. at 8.

Plaintiff alleges that the delay in necessary treatment of his arm and resulting serious pain constitutes cruel and unusual punishment in violation of the Eighth Amendment. He also brings state law claims for negligence and intentional infliction of emotional distress. *Id*. at 3. Plaintiff names (fnu) Mable, nurse employed by Centurion; (fnu) Wilson, doctor employed by Centurion; (fnu) Lumphry, Captain at LCF; Alexis Lang, Unit Team at LCF; the Kansas Department of Corrections ("KDOC"); Centurion; (fnu) (lnu), female doctor employed by Centurion; and (fnu) Pheer, Officer at LCF. Plaintiff seeks a total of $4 million in damages.

## II. The Report

The Report found that Plaintiff did not seek medical attention until 12:37 p.m. the day following his injury, when he obtained a pass from a corrections officer to go to the medical clinic. (Doc. 9, at 5.) Mabel Adams[1], a physician employed by Centurion, told Plaintiff that "this was not the proper procedure to be evaluated for an emergency response." (Doc. 9-2, at 2.) The proper procedure is for an officer to call a medical emergency. *Id*. If it is not a medical emergency, the prisoner puts in a sick call and waits for nursing staff to call him. *Id*. Then, the prisoner comes to the clinic with a pass. *Id*. Plaintiff began demanding to be seen immediately. *Id*. Adams opined that "it is likely Mr. Reynolds was not in immediate distress since it was a day prior that his 'fall' occurred." *Id*. The clinic officer called the SORT team due to Plaintiff's disruptive behavior. *Id*. at 3.

Plaintiff returned to the clinic at some point on June 16, 2023. Bryan Wilson, another Centurion physician, examined him. (Doc. 9-4, at 2: "Mr. Reynolds was examined and it was my

---

[1] It appears that Mabel Adams is the person referred to by Plaintiff as a nurse named (fnu) Mable.

3

impression . . ..") Wilson found that Plaintiff had sustained "an acute fracture to his wrist." *Id*. Plaintiff's wrist was splinted, and he was given a sling and instructed to keep the arm elevated and return to the clinic if he experienced any numbness, tingling, coolness, or delayed capillary refill. *Id*. Plaintiff's wrist was not x-rayed because June 16 was a Friday, and on Fridays, the x-ray technician leaves at 12:00 p.m. *Id*. at 3. Plaintiff was scheduled for an x-ray on the following Monday. *Id*. Wilson states that Plaintiff "was not scheduled to be transferred to the Hospital because the facility was equipped to stabilize Mr. Reynolds and perform his x-ray." *Id*. Wilson further states that Plaintiff was provided with NSAIDs for his pain and was given a Toradol injection for swelling and pain. *Id*.

Plaintiff returned to the clinic at 10:09 p.m. complaining of increased swelling, numbness, and pain. *Id*. Someone evaluated him and decided he did not need emergency care. *Id*. He was told to keep his hand elevated. *Id*. The following night, Plaintiff returned to the clinic again complaining of pain. *Id*. He was again evaluated and found to be in "stable condition and thus did not require emergency treatment." *Id.*

Plaintiff returned for an x-ray on June 19, 2023. *Id.* He had removed his splint and replaced it with a washcloth wrapped with an Ace bandage. *Id*. at 3-4. The x-ray showed a fracture to Plaintiff's distal radial bone with displacement. *Id*. at 4; Doc. 10, at 5. An order for consultation with an orthopedic surgeon was placed, and additional pain medication was ordered. *Id*. Plaintiff was sent to the hospital on June 20, 2023, and he had surgery on his wrist the same day. *Id.*

Medical records included with the Report show that Plaintiff rated his pain as 10/10 and constant at his first visit to the clinic on June 16, 2023. (Doc. 10, at 2.) He was unable to move his hand due to the pain. *Id*. Nurse Practitioner Kerry Bera noted an "obvious deformity" of his left wrist. *Id.* at 7. At Plaintiff's 10:09 p.m. visit to the clinic, medical records show that he

4

complained of "increased swelling, numbness and pain 10/10 in left fingers." *Id*. at 9. The fingers of his left hand were noted as "increased in size in comparison to right." *Id*. at 10. Plaintiff was told to keep his arm elevated. *Id*. On June 18 at 1:13 a.m., Plaintiff reported 10/10 pain radiating from his left shoulder down his left leg. *Id*. at 13. He also reported tingling in his left fingers. *Id*. The provider obtained a voice order for one dose of Toradol 30 mg IM. *Id*. at 14. Plaintiff's x-rays were digitally sent to the hospital on June 19, and a telehealth visit to evaluate Plaintiff's wrist was initially set for June 21, 2023. *Id*. at 19, 21. Plaintiff's Medication Administration Record for June, 2023, shows ibuprofen was started on June 19, three days after Plaintiff's first visit to the medical clinic for his broken arm, and acetaminophen was started on June 21, 2023. *Id*. at 49.

### III. Plaintiff's Response

In his response to the Report, Plaintiff objects to the Report and disputes several allegations. Plaintiff states that he sought care in the morning on June 16 and did not wait until 12:37 p.m. (Doc. 12, at 2.) He asserts that surveillance cameras will support his timeline. *Id*. Plaintiff further disputes that he received any pain medication on June 16; he alleges that he did not receive pain medication until June 18. *Id*. at 4. Plaintiff also again submitted the official response to his grievance, which included information about the surgery performed at the hospital. The surgeon found he had an "extremely comminuted fracture with multiple intercalary fragments. There was shortening due to the brachioradialis muscle spasm, so the tenotomy was performed to allow the fragments to attain the physiologic length. He had a nerve block placed after surgery for pain relief." (Doc. 12-1, at 3.)

Plaintiff alleges that a doctor did not actually examine him until he was at the hospital. (Doc. 12, at 5.) Further, Plaintiff reasserts his claim that other prisoners were sent to the hospital on June 16, 2023, but Plaintiff's injury was disregarded. *Id*.

5

## IV. Discussion

### A. Defendants

Plaintiff named eight (8) defendants in the Complaint. One, the KDOC, was already dismissed by the Court in the M&O. (Doc. 4, at 9.) Plaintiff also names Centurion and three (3) Centurion medical providers, along with three (3) KDOC employees.

Centurion is subject to dismissal. In the Tenth Circuit, "to hold a corporation liable under § 1983 for employee misconduct, a plaintiff must demonstrate the existence of the same sort of custom or policy that permits imposition of liability against municipalities under *Monell v. Department of Social Services*, 436 U.S. 658, 694 . . . (1978)." *Wishneski v. Andrade*, 572 F. App'x 563, 567 (10th Cir. 2014) (unpublished) (citations omitted). A corporation may not be held liable based upon respondeat superior because "vicarious liability is inapplicable to . . . § 1983 suits." *Rascón v. Douglas*, 718 F. App'x 587, 589–90 (10th Cir. 2017) (unpublished) (quoting *Iqbal*, 556 U.S. at 676); *see also Spurlock v. Townes*, 661 F. App'x 536, 545 (10th Cir. 2016) (unpublished); *Green v. Denning*, 465 F. App'x 804, 806 (10th Cir. 2012) (unpublished) ("An entity 'cannot be held liable *solely* because it employs a tortfeasor—or, in other words, [it] cannot be held liable under § 1983 on a respondeat superior theory.'") (citation omitted); *Williams v. Correct Care Sols.*, No. 19-3075-SAC, 2019 WL 2005920, at *2 (D. Kan. May 7, 2019); *Jefferson v. Aramark Corr. Servs.*, Case No. 17-3161-SAC, 2017 WL 6557419, at *2 (D. Kan. Dec. 22, 2017); *Livingston v. Correct Care Sols.*, Case No. 07-3256-SAC, 2008 WL 1808340, at *1–2 (D. Kan. Apr. 17, 2008) (stating that "[a] policy is a formal statement by the private corporation" and "[a] custom is a persistent, well-settled practice of unconstitutional misconduct by employees that is known and approved by the corporation.").

Plaintiff fails to state a claim against Centurion. Plaintiff has not alleged a formal statement by the company or a persistent, well-settled practice of unconstitutional misconduct by employees. Centurion is therefore dismissed.[2]

Captain Lumphry, Unit Team Lang, and Sergeant Pheer are also dismissed from this matter. An essential element of a civil rights claim against an individual is that person's direct personal participation in the acts or inactions upon which the complaint is based. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006); *Foote v. Spiegel*, 118 F.3d 1416, 1423–24 (10th Cir. 1997). Conclusory allegations of involvement are not sufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Plaintiff mentions Pheer in the Complaint but only alleges that Pheer told him that "they took 6 people to hospital and he asked me why I was not taken due to 'Serious Medical Need' of my broken arm. I explained that I didn't know why, he stated he would check . . . .." (Doc. 1, at 2.) Plaintiff also mentions Lang and Lumphry, alleging only that they were "aware" that he needed immediate medical attention but disregarded his health. *Id*. at 6. These allegations are not sufficient to demonstrate that Pheer, Lang, and Lumphry personally participated in violating Plaintiff's constitutional rights.

**B. Eighth Amendment**

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the

---

[2] If evidence of a custom or practice supporting Centurion's liability comes to light as the case progresses, Plaintiff may seek leave to amend his Complaint to add Centurion as a defendant.

'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

The "deliberate indifference" standard includes both an objective and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted). In the objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation omitted). A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

Plaintiff must also satisfy the subjective prong. "The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Sealock*, 218 F.3d at 1209). In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)). "A plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate,' but rather that the official 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Farmer*, 511 U.S. at 842, 843 n.8).

A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment. *See Estelle*,

8

429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) (prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983). However, a jury may infer conscious disregard when a prison doctor "responds to an obvious risk with treatment that is patently unreasonable." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

Delay in providing medical care does not violate the Eighth Amendment, unless there has been deliberate indifference resulting in substantial harm as a result of the delay. *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993). In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted). "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). "Although 'not every twinge of pain suffered as a result of delay in medical care is actionable,' when the pain experienced during the delay is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test." *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (quoting *Kikumura v. Osagie,* 461 F.3d 1269, 1292 (10th Cir. 2006)). *See also McCowan v. Morales*, 945 F.3d 1276, 1291 (10th Cir. 2019) (officer's delay in getting prisoner to detention center which resulted in several hours of excruciating pain associated with his shoulder injury was sufficient to satisfy the objective prong of the deliberate indifference test); *Perotti v. Serbi*, 786 F. App'x 809, 814 (10th Cir. 2019) (finding that substantial pain lasting five days was sufficiently serious to trigger the Eighth Amendment).

The Tenth Circuit recently clarified that "it is possible to have some medical care and still state a claim under the gatekeeper theory." *Lucas*, 58 F.4th at 1139. "The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Id*. (citations omitted). Under the deliberate indifference analysis, "merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability." *Id*. "Instead, a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances." *Id*. (citations omitted).

## V. Conclusion

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citation omitted). The Court "cannot resolve material disputed factual issues by accepting the report's factual findings when they are in conflict with pleadings or affidavits." *Id*. at 1109. "Furthermore, '[a] bona fide factual dispute exists even when the plaintiff's factual allegations that are in conflict with the *Martinez* Report are less specific or well-documented than those contained in the report.'" *Bellamy v. Kansas*, 2024 WL 3718065, at n.5 (10th Cir. Aug. 8, 2024) (unpublished) (quoting *Hall*, 935 F.2d at 1109).

The Court is unable to resolve the factual disputes at this stage of the proceedings and finds that this case survives screening under 28 U.S.C. § 1915A.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's claims survive the Court's screening under 28 U.S.C. § 1915A.

**IT IS FURTHER ORDERED** that Defendants Centurion, Pheer, Lang, and Lumphry are dismissed from this action.

**IT IS FURTHER ORDERED** that the Court will enter a separate service order for service on Defendants Mabel Adams and Bryan Wilson.

The Clerk is directed to change the name of the first defendant from "(fnu) Mable" to "Mabel Adams" on the docket sheet.

**IT IS SO ORDERED**.

**Dated February 5, 2025, in Kansas City, Kansas.**


        **S/   John W. Lungstrum**
        **JOHN W. LUNGSTRUM**
        **UNITED STATES DISTRICT JUDGE**